NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2023 IL App (4th) 220849-U

NO. 4-22-0849

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
March 7, 2023
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| *In re* A.M., a Minor | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Winnebago County |
| Petitioner-Appellee, | ) | No. 19JA302 |
| v. | ) | |
| Maranatha M., | ) | Honorable |
| Respondent-Appellant). | ) | Francis M. Martinez, |
| | ) | Judge Presiding. |

PRESIDING JUSTICE DeARMOND delivered the judgment of the court.
Justices Cavanagh and Harris concurred in the judgment.

**ORDER**

¶ 1    *Held*:   The appellate court affirmed, holding the trial court's finding respondent mother
was unfit to care for the minor was not against the manifest weight of the
evidence, and the court's finding it was in the minor's best interest to terminate
the respondent mother's parental rights was not against the manifest weight of the
evidence.

¶ 2    In July 2019, the State filed a petition for adjudication of neglect with respect to

A.M., the minor child of respondent, Maranatha M. (Mother), alleging A.M. was neglected and

living in an environment injurious to his welfare. In September 2019, the trial court adjudicated

A.M. neglected, made the minor a ward of the court, and placed custody and guardianship with

the Department of Children and Family Services (DCFS). The State filed a petition to terminate

Mother's parental rights as to A.M. in April 2022. Following hearings on the State's petition, the

court found Mother unfit and determined it was in the minor's best interest to terminate her parental rights.

¶ 3    On appeal, Mother challenges the trial court's decision to terminate her parental rights, arguing the unfitness and best-interest determinations were against the manifest weight of the evidence. We disagree and affirm.

¶ 4                                    I. BACKGROUND

¶ 5                                A. Initial Proceedings

¶ 6    On July 11, 2019, the State filed a petition alleging A.M. (born July 8, 2019) was neglected pursuant to section 2-3(1)(b) of the Juvenile Court Act of 1987 (Juvenile Court Act) (705 ILCS 405/2-3(1)(b) (West 2018)). Specifically, the petition alleged A.M. was neglected due to an injurious environment "in that [the] minor's mother has mental health issues that prevent her from properly parenting." According to a DCFS statement of facts contained in the record, one day after A.M.'s birth, Mother "became violent and screaming and telling [her mother] to kill her while [A.M.] was in the room." Additionally, Mother "wanted another newborn screen completed because the blood did not go straight to the lab and 'it could be anybody's blood.' She also wanted to be moved to another room because a staff member coughed in her room, and [Mother] stated the room [was] now 'contaminated.' " When hospital staff attempted to remove A.M. from the room on July 10, 2019, Mother refused. Mother then "attempted to flee the unit with [the minor]. The unit was put on lock down, and security was called." Thereafter, Mother was involuntarily psychiatrically hospitalized, and A.M. was taken into protective custody. The investigator also "observed [Mother] talking to the floor" and noted Mother was "diagnosed with paranoid schizophrenia and flies off the handle for no reason." The investigator further noted

Mother's "history of cocaine abuse." Additionally, Mother reported she and A.M.'s father, Charles P. (Father), were not "getting along [because] he is abusive towards her."

¶ 7         In September 2019, based upon a stipulation by the parties, the trial court entered an adjudicatory order finding A.M. neglected. In October 2019, the court entered a dispositional order finding Mother unfit and unable, for reasons other than financial circumstances alone, to care for, protect, train, or discipline A.M., and the best interest of the minor would be jeopardized if he remained in the custody of Mother. The court adjudged A.M. neglected, made him a ward of the court, and placed custody and guardianship with DCFS.

¶ 8                          B. Termination Proceedings

¶ 9         In April 2022, the State filed a petition to terminate Mother's parental rights to A.M. Count I of the petition alleged Mother failed to protect A.M. from conditions within the environment injurious to his welfare pursuant to section 1(D)(g) of the Adoption Act (750 ILCS 50/1(D)(g) (West 2018)). Count II further alleged Mother was unfit based on her failure to make reasonable progress toward the return of A.M. pursuant to section 1(D)(m)(ii) of the Adoption Act (750 ILCS 50/1(D)(m)(ii) (West 2018)) for two nine-month periods between April 26, 2020, to January 26, 2021, and June 11, 2021, to March 11, 2022.

¶ 10                          1. *Unfitness Hearing*

¶ 11         At the May 2022 unfitness hearing, Evanya Perry-Burks, a caseworker for Youth Service Bureau of Illinois Valley, outlined the services contained in Mother's service plans and stated the agency's primary goals related to Mother's mental health and the ongoing domestic violence between her and Father. Although Mother participated in the recommended services, when Perry-Burks took over the case, "there was a no contact order between the two parents. They both were *** supposed to be held accountable and not be in each other's presence."

Perry-Burks explained the agency's concerns about the parents' domestic violence issues stemmed from "recent arrests for violations of [the] no contact order" as well as the fact there had been "no length of time throughout the case with stability or an absence of *** domestic violence reports of arrests." Yet, Perry-Burks said Mother persisted in an on-and-off relationship with Father throughout the entirety of the case, and she was currently residing with him despite the no contact order. Perry-Burks testified the parents requested to participate in visitations together and had been observed meeting up after visits. Furthermore, Mother "appeared to struggle with attending visitations" and missed several visits with A.M. after reporting to Perry-Burks that "it was a lot for her mental stability at the moment." After testimony from Perry-Burks, the State submitted into evidence DCFS's "indicated packet," as well as People's exhibit Nos. 1-6, which were various police reports and family service plans created over the course of the relevant nine-month periods. Thereafter, the trial court continued the hearing to June 2022.

¶ 12 At the next hearing, Father appeared and was called by his attorney to testify. Father testified Mother had been arrested in March 2021 for battery. He also acknowledged being arrested for aggravated battery in June 2021. Regarding that incident, Father stated Mother became "a little upset" and "started hanging out the door" of the vehicle he was driving. At some point, Mother "grabbed [the] steering wheel" and "tried throwing [them] into oncoming traffic." According to Father, he "got her off the steering wheel" by "pushing her back[,] which caused her to get a cut on her head." He further admitted he attended Mother's therapy sessions, as recently as January 2022, and testified he and Mother had been residing together since March 2022, despite the no contact order.

¶ 13　　　　Mother testified on her own behalf. She acknowledged visiting A.M. infrequently from June 11, 2021, to March 11, 2022, because she did not feel well enough or stable enough. Although Mother received her last injection of antipsychotic medication in April 2021, she stated "the effects did not go away," and she continued hearing voices and having "this overwhelming tingling sense of anger" intermittently through December 2021. However, Mother claimed she "did not hear any voices anymore" and "felt completely normal" following her bout with COVID-19 in January 2022.

¶ 14　　　　Mother testified she was self-employed and presently engaged in a professional relationship with Father. She stated her work involved "cleaning for landlords" and explained, "[Father] does the construction side and then he refers them to me and I do the clean-up." Mother further testified she and Father "had met up at McDonald's a few times" since February 2022, and she admitted she was currently in a dating relationship with him. She also admitted Father committed domestic violence against her. With respect to the incident in June 2021, Mother stated she attempted to jump out of the van as Father was driving and pulled the wheel. According to Mother, "[h]e pushed [her] back and [her] head hit the CD/radio holder that's in his work van." She also acknowledged her arrests in December 2020 and December 2021 for battering Father and striking his son.

¶ 15　　　　Ultimately, the trial court found Mother unfit, specifically noting the State proved count II by clear and convincing evidence, as well as count I, which "was the subject of the investigative packet that was accepted and submitted as evidence." The court also noted People's exhibit Nos. 3-5, which were three service plans created over the course of the relevant nine-month periods "to address the mental health issues and other issues that the integrated assessment previously conducted recommended for treatment." The court stated, "All three of

these service plans *** rated [M]other unsatisfactory in confronting her issues of mental health," which the court found to be "especially concerning since this case *** came into care as a result of mother having a mental health crisis." The court also noted Mother's testimony regarding her relationship with Father. Although "[Mother] appeared to be telling the [c]ourt that everything was fine," the court noted her admissions to repeatedly violating the no contact order—as well as the issues of domestic violence that arose between them—and found "[her] testimony simply *** unconvincing."

¶ 16                                2. *Best-Interest Hearing*

¶ 17        In August 2022, the matter proceeded to the best-interest hearing. The best-interest report indicated A.M. had been living with his foster mother, Jessica Stuckey, since January 2020. Her home is "the only home that [A.M.] has known." A.M. appeared to be "thriving in the home," and he was receiving "medical care, developmental care, and affection appropriate to his level of needs." The report indicated the foster mother "remained open to the importance and value of [A.M.] completing his Lifebook in order to hold on to memories, experiences, and biological relatives."

¶ 18        The State recalled Evanya Perry-Burks, who testified the foster mother attends to all of A.M.'s medical, emotional, and physical needs and she has been helping the minor with the development of his identity. Despite being "almost completely nonverbal," Perry-Burks testified A.M. "responds very affectionately towards the [foster mother] and seems at ease." Perry-Burks also "observe[d] him to feel safe and feel nurtured in that home," and she stated A.M.'s current placement is where he feels love, attachment, continuity of affection, and a sense of familiarity. A.M. got along "[v]ery well" with the foster mother's family, and Perry-Burks further stated the foster mother had expressed her desire to adopt A.M.

¶ 19 Although she admitted she "miss[ed] some visits due to [her] mental health at the time," Mother testified A.M. referred to her as "[m]ommy and momma," even though he had difficulty "verbalizing things." She further testified she and Father were "not going to work out," and she had since moved into her own apartment after he "head-butted" her. Mother stated, "The first time he head-butted me[,] I had a black eye. The second time he head-butted me[,] I had called the police and I had him arrested." According to Mother, Father was most recently arrested for battering her in August 2022.

¶ 20 In looking at A.M.'s best interests, the trial court recognized the minor had "spent the vast majority of his life" in his current placement. The court stated A.M. "deserve[d] permanency and a healthy environment," and the court observed A.M. to be "bonded in the home of his foster placement." The court noted A.M. appeared "thoroughly integrated in that home." The court also commented on the "multiple violations of law by [Father]" and further noted the relationship between him and Mother "remain[ed] toxic and, therefore, an injurious environment to this minor." Ultimately, the court determined "no progress has been made during the course of this case seeking reunification," found termination of Mother's parental rights was in the best interest of A.M., and ordered the permanency goal to be changed to adoption.

¶ 21 This appeal followed.

¶ 22 II. ANALYSIS

¶ 23 We initially comment on the delay in the issuance of this order. As a matter addressing the custody of minor children, this case is subject to expedited disposition under Illinois Supreme Court Rule 311(a)(5) (eff. July 1, 2018), requiring the appellate court to issue its decision within 150 days after the filing of a notice of appeal, except for good cause shown. Mother filed her notice of appeal on September 22, 2022, and this case was submitted for our

review on January 9, 2023. Although every effort was made to comply with the deadline under Rule 311(a)(5), Mother's counsel's requests for extensions of time to file both a docketing statement and appellant's brief, as well as other procedural complexities, truncated this court's time to consider this appeal. Thus, we find good cause exists for the delay.

¶ 24 On appeal, Mother challenges the trial court's decision to terminate her parental rights, arguing the unfitness and best-interest determinations stand against the manifest weight of the evidence.

¶ 25 The Juvenile Court Act (705 ILCS 405/1-1 *et seq.* (West 2018)) and the Adoption Act (750 ILCS 50/1 *et seq.* (West 2018)) govern how the State may terminate parental rights. *In re D.F.*, 201 Ill. 2d 476, 494, 777 N.E.2d 930, 940 (2002). Together, the statutes outline two necessary steps the State must take before terminating a person's parental rights—the State must first show the parent is an "unfit person," and then the State must show terminating parental rights serves the best interest of the child. *D.F.*, 201 Ill. 2d at 494-95 (citing the Adoption Act (750 ILCS 50/1(D) (West 1998)) and the Juvenile Court Act (705 ILCS 405/2-29(2) (West 1998))). Here, Mother challenges the trial court's determinations at each of these steps. We address her challenges in turn.

¶ 26                                     A. Unfitness Finding

¶ 27 Mother first argues the State failed to prove her unfit by clear and convincing evidence based on her failure to make reasonable progress and "by relying solely on the indicated packet to prove that Mother failed to protect A.M. from an injurious environment."

¶ 28 In a proceeding to terminate a respondent's parental rights, the State must prove unfitness by clear and convincing evidence. *In re A.L.*, 409 Ill. App. 3d 492, 500, 949 N.E.2d 1123, 1129 (2011). The Adoption Act provides several grounds on which a court may find a

parent "unfit." One is a parent's "[f]ailure to protect the child from conditions within his environment injurious to the child's welfare." 750 ILCS 50/1(D)(g) (West 2018). Another basis for a finding of unfitness involves a parent's failure to make reasonable progress toward the return of the child to the parent during any nine-month period following the adjudication of neglect or abuse. 750 ILCS 50/1(D)(m)(ii) (West 2018). Reasonable progress includes a parent's compliance with service plans and court directives, "in light of the condition which gave rise to the removal of the child, and in light of other conditions which later become known and which would prevent the court from returning custody of the child to the parent." *In re C.N.*, 196 Ill. 2d 181, 216-17, 752 N.E.2d 1030, 1050 (2001). "We have held that 'reasonable progress' is an 'objective standard' and that a parent has made reasonable progress when 'the progress being made by a parent to comply with directives given for the return of the child is sufficiently demonstrable and of such a quality that the court, in the *near future*, will be able to order the child returned to parental custody.' " (Emphasis in original). *In re F.P.*, 2014 IL App (4th) 140360, ¶ 88, 19 N.E.3d 227 (quoting *In re L.L.S.*, 218 Ill. App. 3d 444, 461, 577 N.E.2d 1375, 1387 (1991)). Despite multiple bases for unfitness, "one statutory ground [is] enough to support a [court's] finding that someone [is] an 'unfit person.' " *F.P.*, 2014 IL App (4th) 140360, ¶ 83; see also *In re Daphnie E.*, 368 Ill. App. 3d 1052, 1064, 859 N.E.2d 123, 135 (2006) ("A finding of unfitness will stand if supported by any one of the statutory grounds set forth in section 1(D) of the Adoption Act.").

¶ 29    " 'A determination of parental unfitness involves factual findings and credibility assessments that the trial court is in the best position to make.' " *In re Richard H.*, 376 Ill. App. 3d 162, 165, 875 N.E.2d 1198, 1201 (2007) (quoting *In re Tiffany M.*, 353 Ill. App. 3d 883, 889-90, 819 N.E.2d 813, 819 (2004)). A reviewing court accords great deference to a trial court's

finding of parental unfitness, and such a finding will not be disturbed on appeal unless it is against the manifest weight of the evidence. *In re N.T.*, 2015 IL App (1st) 142391, ¶ 27, 31 N.E.3d 254. " 'A court's decision regarding a parent's fitness is against the manifest weight of the evidence only where the opposite conclusion is clearly apparent.' " *In re M.I.*, 2016 IL 120232, ¶ 21, 77 N.E.3d 69 (quoting *In re Gwynne P.*, 215 Ill. 2d 340, 354, 830 N.E.2d 508, 517 (2005)).

¶ 30        Here, the trial court's finding of unfitness was not against the manifest weight of the evidence. Mother unquestionably loved the minor. Nevertheless, the court was entitled to find Mother's level of responsibility was not objectively reasonable, especially during the period between when Mother was involuntarily psychiatrically hospitalized and A.M. was taken into protective custody and when the goal changed to termination of parental rights. The evidence at the unfitness proceeding revealed "there was a no contact order between the two parents." Both Mother and Father were "to be held accountable and not be in each other's presence." Yet, throughout the entirety of the case, Mother continued in a tumultuous relationship with Father and repeatedly violated the no contact order. In fact, as of the time of the unfitness hearing, she resided with him. Her lack of effort to comply with the no contact order was significant considering DCFS's legitimate concerns about the parents' domestic violence issues stemming from "recent arrests for violations of [the] no contact order" as well as the fact there had been "no length of time throughout the case with stability or an absence of *** domestic violence reports of arrests." We note Mother was arrested in December 2020, and again in December 2021, after she battered Father and struck his son. Mother also "appeared to struggle with attending visitation," and she acknowledged visiting A.M. infrequently from June 11, 2021, to March 11, 2022.

¶ 31 Mother did actively engage in the recommended mental health services; however, evidence of any assimilation of the lessons was lacking. All three service plans over the relevant nine-month periods rated Mother as unsatisfactory in confronting her issues of mental health and, after becoming "a little upset" in June 2021, she could not control her temper and "started hanging out the door" of the van Father was driving. At some point, Mother "grabbed [the] steering wheel" and "tried throwing [them] into oncoming traffic." Although she attributed the lingering effects to her antipsychotic medication, Mother continued to have "this overwhelming tingling sense of anger" intermittently through December 2021. The court appropriately noted Mother's failure in confronting her issues of mental health and found it "especially concerning since this case *** came into care as a result of mother having a mental health crisis."

¶ 32 Based on this record, it was not against the manifest weight of the evidence for the trial court to conclude Mother failed to make reasonable progress during the nine-month time frames alleged in the termination petition because of her failure to comply with DCFS directives. See *C.N.*, 196 Ill. 2d at 216-17, 752 N.E.2d at 1050 (stating reasonable progress includes a parent's compliance with service plans and court directives in light of the condition which gave rise to the removal of the child). Consequently, we owe the court the deference it deserves. See *N.T.*, 2015 IL App (1st) 142391, ¶ 27 (stating a reviewing court affords great deference to a trial court's fitness findings and will not reverse the court's decision unless it was contrary to the manifest weight of the evidence); *In re Keyon R.*, 2017 IL App (2d) 160657, ¶ 16, 73 N.E.3d 616 (stating a decision is against the manifest weight of the evidence only if the opposite conclusion is clearly apparent, or if it is unreasonable, arbitrary, or not based on the evidence). Accordingly, because we can affirm the trial court's unfitness finding on this basis, we need not address the remaining ground. See *In re H.D.*, 343 Ill. App. 3d 483, 493, 797 N.E.2d 1112, 1120 (2003) ("As

the grounds for unfitness are independent, the trial court's judgment may be affirmed if the evidence supports the finding of unfitness on any one of the alleged statutory grounds.").

¶ 33                              B. Best-Interest Finding

¶ 34         Once a parent is found "unfit," the trial court must next decide whether terminating parental rights serves the child's best interest. "[A]t a best-interests hearing, the parent's interest in maintaining the parent-child relationship must yield to the child's interest in a stable, loving home life." *In re D.T.*, 212 Ill. 2d 347, 364, 818 N.E.2d 1214, 1227 (2004); see also *In re Julian K.*, 2012 IL App (1st) 112841, ¶ 80, 966 N.E.2d 1107 (stating once the trial court finds the parent unfit, "all considerations, including the parent's rights, yield to the best interests of the child"). When considering whether termination of parental rights serves a child's best interest, the trial court must consider several factors within "the context of the child's age and developmental needs." 705 ILCS 405/1-3(4.05) (West 2018).

¶ 35         A trial court's finding that termination of parental rights is in a child's best interest will not be reversed on appeal unless it is against the manifest weight of the evidence. *In re Dal. D.*, 2017 IL App (4th) 160893, ¶ 53, 74 N.E.3d 1185.

¶ 36         At the best-interest hearing, the trial court heard how A.M. had "spent the vast majority of his life" in his current placement. The foster mother attended to all A.M.'s needs, had a strong bond with A.M., and intended to adopt him. Although Mother shared a bond with the minor, she admitted missing several visits "due to [her] mental health at the time" and failed even the simple task of refraining from contact with Father pursuant to the no contact order. Instead, throughout the almost four years the case has been pending, Mother repeatedly violated the no contact order by persisting in a "toxic" and abusive relationship with Father and failed to address the issues that caused A.M. to come into care. The court stated A.M. "deserve[d]

permanency and a healthy environment," and the best-interest report indicated A.M.'s current foster placement is "the only home that [he] has known." The report also indicated the foster mother "remained open to the importance and value of [A.M.] completing his Lifebook in order to hold on to memories, experiences, and biological relatives." The court observed A.M. to be "bonded in the home of his foster placement" and "thoroughly integrated in that home." A.M. also appeared to be "thriving in the home," and he was receiving "medical care, developmental care, and affection appropriate to his level of needs." When weighed against a legitimate concern for permanency for a child of tender years, the court's finding termination was in A.M.'s best interest is not against the manifest weight of the evidence.

¶ 37        All told, the record shows A.M. feels loved, valued, secure, and nurtured in his current placement and has structure and continuity, and it supports the trial court's decision. Terminating Mother's rights served the minor's best interest. The decision is neither unreasonable nor arbitrary. *Keyon R.*, 2017 IL App (2d) 160657, ¶ 16. Since the evidence does not lead us clearly to the opposite conclusion, we cannot say the trial court's best-interest determination goes against the manifest weight of the evidence. *Keyon R.*, 2017 IL App (2d) 160657, ¶ 16.

¶ 38                                III. CONCLUSION

¶ 39        For the reasons set forth above, we affirm the trial court's judgment.

¶ 40        Affirmed.